**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**(Richmond Division)**

| | | |
|---|---|---|
| **W.A.K., II a minor, who sues by Page S. Karo,** | ) | |
| **his next friend, natural guardian, and mother,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No.  3:09CV00575 (HEH)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WACHOVIA BANK, N.A. Individually** | ) | |
| **and as Co-Trustee of the Rosalie S. Karo Trust** | ) | |
| **u/a October 18, 1966,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| **WACHOVIA BANK, N.A. Individually** | ) | |
| **and as Co-Trustee of the Rosalie S. Karo Trust** | ) | |
| **u/a October 18, 1966** | ) | |
| **Third-Party Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **William A. Karo,** | ) | |
| **Third-Party Defendant.** | ) | |

**WACHOVIA BANK, N.A.'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**
**AGAINST ALL COUNTS OF PLAINTIFF'S COMPLAINT AND FOR PARTIAL**
**SUMMARY JUDGMENT AGAINST THIRD-PARTY DEFENDANT**

D. Alan Rudlin (Bar # 17010)
William P. Childress (Bar # 72823)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia  23219
Phone:  804-788-8200
Fax:  804-788-8218
Email: arudlin@hunton.com
Email:  wchildress@hunton.com

## TABLE OF CONTENTS

I.      **PRELIMINARY STATEMENT** ................................................. 1

II.    **STATEMENT OF UNDISPUTED MATERIAL FACTS** ........................ 2
    A.  **The Origin And Terms Of The Rosalie S. Karo Trust (1966)** ................... 2
    B.  **The Initial Years Of The Trust (1967 - 1997)** ................................... 2
    C.  **The Drew Karo Family** .................................................... 3
    D.  **Recent Years Of The Karo Trust (1998 - 2007)** ............................. 5
    E.  **The Events Of 2008-2009:  Recession; Drew's Debts; And Multiple Lawsuits** ......... 8

III.    **STANDARD OF REVIEW** .................................................. 10

IV.    **ARGUMENT** ............................................................ 10
    A.  **Governing Trust Law Principles** .......................................... 10

    B.  **Wachovia Has Met Its Fiduciary Duty In Compliance With The Intent Of Rosalie Karo** .......................................................................... 11
      1.  Rosalie Karo's Trust Document Made Clear The Duties Of Her Co-Trustees. ........... 11
      2.  There Was No Duty To Diversify Investments As Rosalie Karo Waived The Prudent Investor Rule And Expressly Authorized The Retention Of Stock Of The Bank Co-Trustee ...................................................................... 12
      3.  Rosalie's Intent And The Trust Retention Language Remain Valid Today Despite The Ruling In *Hirsh* v. *Hirsh*. .................................................... 13
      4.  Trustees Are Not The Guarantors of Investment Performance. ..................... 16

    C.  **Wachovia Did Not Breach Any Duty Of Loyalty To W.A.K.:** ................... 18
      1.  Discretionary Distributions To Drew Were Proper ......................... 18
      2.  Toney Karo Was A Participating Co-Trustee With Whom The Bank Adequately Communicated ................................................................ 19
      3.  The Conflict From Holding Wachovia Stock Was Not A Breach of Loyalty ............. 20
      4.  Wachovia Did Not Fail To Act As Sole Trustee ......................... 21
      5.  There Was No Breach For Not Seeking Aid And Guidance From A Court ................ 22

    D.  **Wachovia Is Entitled to Summary Judgment For All Plaintiff's Claims.** ............... 23
      1.  No Liability Exists Where A Beneficiary Consents To Or Ratifies The Conduct He Claims Is A Breach Or Otherwise Releases The Fiduciary From Liability. ............... 24
      2.  A Minor Beneficiary May Be Represented And Bound By Another In Trust Matters . 26

    E.  **Partial Summary Judgment Should Be Entered Against Drew Karo For Contractual Indemnification.** ..................................................... 33

V.    **CONCLUSION** ......................................................... 35

\* \* \* \* \* \*

NOTE:  All References to the fact record will be made to the accompanying Appendix, and the page number within that document.

.

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 11

*Cannon v. Dixon*, 115 F.2d 913 (4th Cir. 1940) ........................................................... 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 10

*Cochran v. Gehrke, Inc.*, 293 F. Supp. 2d 986 (N.D. Iowa 2003) .................................. 33

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ............................................................... 16

## STATE CASES

209 Va. 630, 166 S.E.2d 286 (1969) ............................................................................. 14

*American Spirit Insurance Co. v. Owens*, 261 Va. 270, 541 S.E.2d 553 (2001) ............. 34

*Beyer v. First National Bank*, 843 P.2d 53 (Colo. Ct. App. 1992) .................................. 33

*In re Estate of Abrams*, 242 A.D.2d 450 (N.Y. App. Div. 1st Dep't 1997) .................... 30

*In re Estate of Fuller*, 57 Misc. 2d 174 (N.Y. Sur. Ct. 1968) ......................................... 29

*In re Estate of Lange*, 75 N.J. 464, 383 A.2d 1130 (1978) ............................................. 32

*In re Estate of Putignano*, 82 Misc. 2d 389 (N.Y. Sur. Ct. 1975) .................................. 29

*Harris v. Citizens Bank, Etc. Co.*, 172 Va. 111, 200 S.E. 652 (1939) ............................. 24

*Hoffman v. First Va. Bank of Tidewater*, 220 Va. 834, 263 S.E.2d 402 (1980) 11, 13, 15, 19

*Indian Head Nat. Bank v. Theriault*, 96 N.H. 23, 69 A.2d 226 (N.H. 1949) .................. 29

*NationsBank of Virginia, N.A. v. Estate of Grandy*, 248 Va. 557, 450 S.E.2d 140
    (1994) .....................................................................................................12, 19, 28

*Estate of Pew*, 655 A.2d 521 (Pa. Super. Ct. 1994) ....................................................... 18

*Pocahontas Mining L.L.C. v. Jewell Ridge Coal Corp.*, 263 Va. 169, 556 S.E.2d
    769 (2002) ............................................................................................................ 34

*Ward v. NationsBank*, 256 Va. 427, 507 S.E.2d 616 (1998) ......................................... 11

**MISCELLANEOUS**

3 William F. Fratcher, *Scott on Trusts*, § 231.4 at 546 (4th ed. 1988) ........................... 15

## I.      PRELIMINARY STATEMENT

This lawsuit involves a couple, Page and Drew Karo (the "Karos"), whose affluent lifestyle prior to the "Great Recession" of 2008 was financed largely by dividends from Drew Karo's inherited Wachovia stock and Wachovia stock held in the Karo Trust, as well as significant personal loans.  For decades, the Karos reaped large financial rewards from their persistent determination to retain, both directly and indirectly, as much Wachovia stock as they could, despite Wachovia's repeated recommendations to Drew, personally and as beneficiary of the Karo Trust, and to Toney Karo, as co-trustee and beneficiary of the Karo Trust, to diversify the family's investments in Wachovia.  Drew and Toney consistently rejected this advice.  The Trust Agreement expressly required unanimity by co-trustees on investments.  As true of many, the Karos' bubble burst in 2008 when they and the Karo Trust lost significant investment value from the unprecedented global financial crisis.   Rather than respond by saving more and spending less, their response has been a series of procedural maneuvers, the latest being this suit by their minor son, W.A.K., to claim that Wachovia should insure them by covering the Karo Trust's purported losses of over $2 million.  The Karos claim that Wachovia is responsible because it failed both to predict the future and to override the grantor's clear intent as well as the beneficiaries' and its co-trustee's express investment directions.  This is a procedural stratagem to obtain what the Karos have tried but failed to get in the past: immediate ownership of the Trust assets.  This Court should reject such a manipulation and decline to stretch the boundary of a trustee's fiduciary duty beyond any concept recognized in the law.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     The Origin And Terms Of The Rosalie S. Karo Trust (1966)

Rosalie Schwarzschild Karo ("Rosalie") was one of five children of Harry Schwarzschild, III, a founder of the Central National Bank ("CNB"), in Richmond, Virginia. (A015.)  When her father died, Rosalie inherited a large number of shares in CNB, which she used to fund a trust (the "Karo Trust" or the "Trust") in October 1966.  (A061-074.)  Rosalie named CNB and her husband, Andrew T. Karo ("Toney"), as co-trustees of the Trust.  (Id.)  The Karo Trust's initial holdings of CNB stock represented approximately 55% of the Trust's value. (A227-28 at ¶ 44.)  Article III, clause 1 of the Trust grants the co-trustees unfettered discretion over the Trust's investments. (A068, 74.)  It expressly empowered them to retain as permanent investments the original trust assets, including specifically stock issued by the corporate trustee (i.e., CNB).  (Id.)  Article I, clause 4 directs the trustees to pay Toney for his lifetime all net trust income, while also authorizing them to distribute principal to any of Rosalie's issue to provide for their general welfare and comfort (A074.)  Any assets remaining at Toney's death are to be distributed to Rosalie's then living issue per stirpes. (A68, 75.)  Rosalie and Toney had one child, William A. Karo ("Drew"), who has been the sole presumptive remainderman at all relevant times in the Amended Complaint.  Drew married Page Karo in August 1997, and they had one child, W.A.K., II ("W.A.K."), who was born in 1998, and became a permissible contingent remainderman beneficiary. (A002); (A066-67.)

### B.     The Initial Years Of The Trust (1967 - 1997)

In 1969, Rosalie wrote to a CNB officer to explain her purpose in setting up the Trust with CNB – a desire for "Toney to have complete control…"  (A124,127.); (A025.)  When Rosalie died in 1974, the value of Trust was approximately $286,729.12 and the CNB shares

constituted approximately 60% of the value of the account.  (A227-28 at ¶ 44.)  In subsequent years, CNB was involved in a number of mergers, finally becoming Central Fidelity Bank, which merged with Wachovia, and later with First Union, which retained the Wachovia name.  By 1997, the Trust's concentration of Bank stock[1] was 58% of its total assets (Id.).  On multiple occasions over the years, Bank representatives recommended to the co-trustee and to Drew, as the only other living trust beneficiary, and as representative of all other potential remainder beneficiaries of the Trust, that the concentration of the Bank stock be reduced, but both Toney and Drew disagreed.  (A039.)  In letters starting as early as 1988 (10 years before W.A.K. was born), the Bank's trust advisor for the Karo Trust, Charles Paul, recommended to Toney that the Trust's concentration of the Bank stock be reduced.  (A131.)  Paul continued to write such letters during his time as trust advisor for the Trust.  (A133-137.)  At all times during Paul's tenure and continuing thereafter, Toney had strong feelings about not selling the Bank stock and was adamant that the Trust retain the Bank stock.  (A039.)

## C.    The Drew Karo Family

Drew graduated from college in 1981, and spent his early years working at United Virginia Bank.  (A013, 112-113.)  Thereafter he worked in commercial real estate, while buying and selling residential and multifamily properties for his own account.  (A112-113.)  He became involved with the Karo Trust shortly after graduating college where he participated in meetings with various trust advisors and learned that his father was a co-trustee.  (A026.)  Drew was aware of the interest he had in the Trust and had his own copy of the Trust Agreement since 1996.  (A126.)  Drew became an experienced and sophisticated investor.  (A022,030,112-13.)  From

---

[1] For ease of reference, the term "Bank" or "Bank stock" refers to Wachovia and its predecessor banks and the stock of each, from the time of the original CNB stock used to fund the Trust in 1966.

1996 to 1998, Drew got into the trust business himself by investing in, serving on the advisory board of, and doing business development for a newly established trust company in Richmond, Tredegar Trust Co.(A021, 112-13.)  He later sold his interest in Tredegar for a profit.  (A015.) In more recent years, Drew has been managing his own investments on a full-time basis as well as "raising capital for several small venture capital deals."  (A112-13.)  He has been involved in the stock market since he was a young adult.  (A018.)  Drew's personal investment activities included buying and selling stock, interests in limited partnerships, and real estate in Palm Beach, Florida. (A207 at ¶ 6.).  He used stock margin loans, calls, and puts.  (A022; 168) (A059; A114-121.)  Over the years, Drew retained a variety of lawyers and financial investment advisors and brokers.  (A020,023.);(A207 at ¶ 8.)  Drew personally held a substantial number of shares in Wachovia stock, which he inherited from family.  (D. Karo Answer at ¶ 35.); (A020.)  Until recently, Drew and his family's primary financial support in the last 10 years has been income generated by dividends from his personal Bank stock.  (A020, 047-048.)  Drew believed it was in the best interest of his family to hold the Bank stock he had personally inherited because of the low-cost basis and because he believed it was an excellent investment that would continue to appreciate in value while also providing him substantial dividend income. (A208 at ¶ 9.)(D. Karo Answer at ¶ 28).  Drew followed the fundamentals of the Wachovia stock because of his personal holdings.  (A009,023.). On October 31, 2007, Drew purchased call options on Wachovia stock through his personal brokerage account because he believed Wachovia stock was going to increase in value.  (A021, 120.)

Page Karo is an honors college graduate in economics.  (A054-55.)  Prior to her marriage to Drew, Page was employed for 16 years by a large international corporation, where her responsibilities included data interpretation for presentations to senior management.  (A003.)

Page uses a financial advisor for her own personal investment holdings, the same investment advisor that Drew has used from time to time (A005), and with whom Drew joined as an original investor in the Tredegar Trust Co.   (A112-113.) Page understands the importance of asset allocation and diversification as investment concepts and believes her financial acumen and abilities would qualify her to serve as a trustee in the management and oversight of the Karo Trust.  (A006.)

**D.**   **Recent Years Of The Karo Trust (1998 - 2007)**

Faye Harris took over from Charles Paul as Wachovia trust advisor for the Karo Trust in 2000 and continues to serve in that capacity.  (A214 at ¶ 2.)  In 2001, Rick Hinchberger became the Wachovia portfolio investment advisor for the Karo Trust.  (A230 at ¶230.)  Upon taking over from Paul, Harris began efforts to meet with Toney to discuss diversification and other Trust matters; Drew always responded on behalf of his father that Toney did not want to have to attend any meetings at the Bank regarding the Trust, nor did he want to deal with Wachovia over the phone or through a visit to his home.  (A0216 at ¶ ¶ 6-7); (A231 at ¶ 5.).  Drew's assertions were consistent with Toney's reputation as a reclusive and shy man.  (A004.)  Drew told Harris that his father was always going to consult with Drew about any investment or other decisions regarding the Trust, and told Harris that Toney's clear preference was for the Bank to communicate with Toney through Drew. (A216 at ¶ 6.)  Drew promised he would talk to his father about the Bank's communications and after Toney's decision was made he would relay it back to the Bank. (Id. ); (A231 at ¶ 15); (A209 at ¶ 15); (A030,39, 45, 131.)  In the decade prior, Drew had communicated investment decisions from his father to the Bank, which his father confirmed and approved in writing.  (A028, 127-130).  Drew presented numerous documents to his father related to the Karo Trust account and its investments.  Drew frequently discussed with

his father the contents or purpose of the documents related to Trust investments which he presented to his father.  (A028,29,33-34,36-37,41-44.)  Drew did not present documents to his father for signature that his father did not understand.  (A028.)

In 2001, Wachovia merged with First Union, continuing as Wachovia.  From 2001 to 2008, Harris and the Trust's investment advisors at the Bank met formally with Drew approximately two to three times each year regarding the Trust.  (A0217 ¶¶ 8, 10.)  During these meetings, Harris and the portfolio managers communicated to Drew the risks associated with holding a concentration in Wachovia stock.  (A218-19 at ¶16-17); (At 208 at ¶ 12); (A231 at ¶ 11); (A039).  They told Drew that the Bank could not offer advice to Toney or him regarding the quality of the Wachovia stock because of the potential conflict of interest involved, and encouraged him to seek outside counsel if he wished.  (A219-20,223 at ¶¶ 18, 19, 28); (A235 at ¶ 19.)  Drew continued to represent to the Bank at all times that he was conveying all this information about the Trust to and from his father as co-trustee.  (A216 at ¶ 6.)  In meetings with Bank employees, Drew justified his father's wish to continue holding the Wachovia stock by pointing to Trust language that expressly permits the corporate trustee to hold its own stock.  (A220 at ¶ 20.)  Drew told Harris this language authorized the co-trustees to hold the Bank stock.  (Id.)  While Harris acted as a trust advisor, Wachovia received numerous signed documents from Toney as he performed his co-trustee duties relating to the Trust's investments and participated its administration. (A231 at ¶ 9); (A075-81,139-40 153-58,159-165.)  As a result of Wachovia's persistent diversification recommendations, Toney and Drew finally gave limited consent in 2003 and 2004 to sell approximately 11,000 shares of Bank stock.  (A220 at ¶ 21.)  No permission was granted thereafter for any additional sales, and Drew personally opposed any additional sales of the stock from 2005 to 2008.  (A219-20 at  ¶ 17, 19, 24-25.)  The trustees

never purchased any shares of the Bank's stock. (Id. ¶ 56.)  Rather, the Trust's concentration varied only as the Wachovia shares grew in value, or other assets were sold.

Beginning in 2003, based on practices adopted from First Union following its merger with Wachovia, the Bank insisted that if the Karo beneficiaries wanted to continue to reject diversification, accept the risks of concentration, and the implications arising from the Trust holding the Bank's own stock, Toney and Drew would need to sign a "Letter of Retention" ("LOR"). (Id. ¶ 56); (A234 at ¶ 15.); (A222 at ¶ 26 );(A038.)  The Bank typically used such LORs when a co-trustee and beneficiaries of a trust insisted on retaining certain types of stock that were deemed exceptions to the Bank's approved type of trust assets.[2] (A219 at ¶ 16.); (A240 at ¶ 11.)  By signing the LORs, Toney (as income beneficiary), and Drew (as residual beneficiary and on behalf of future remainder and current distributions beneficiaries), made clear they understood and accepted for themselves and their heirs and assigns the risks described in the letters. (A075-084.)  All this was explained to Drew at meetings.  (A22-23 at ¶ 26-29); (A209 at ¶ 13); (A235 at ¶ 18); (A037).  Drew understood from the LORs that corporate trustee could not offer advice regarding the Bank stock held by the Trust because of the potential conflict of interest.  (A041).  Wachovia expressly advised them to consult an attorney if they had any questions. (A223 at. ¶ 28); (A077-84.)  In the years when Drew signed the LORs, he was using the services of an attorney for trust and estate matters.  (A021.)  Toney and Drew agreed in the LORs to indemnify the Bank should any claims arise as a result of the retention of the overconcentration of Wachovia stock. (A075-084.)  LORs were signed by Toney in 2003, and by Toney and Drew in 2004, 2005, and 2007. (Id.)

---

[2] These exceptions categories included stock concentrations (more than 10% of a trust portfolio) or stock of the bank itself.

The Bank's Trust Committee reviewed the Karo Trust annually to comply with Regulation 9 of the Comptroller of the Currency, and ensure that the Karo Trust was complying with federal requirements applicable to national banks. (A240 at ¶ 10.) Even after the LORs were signed, Wachovia continued to recommend Bank stock diversification and to work with Drew to gain Toney's consent to further reduce the concentration.  (A219 at ¶ 17.)

### E.  The Events Of 2008-2009:  Recession; Drew's Debts; And Multiple Lawsuits

During 2008, as the economy worsened, the Wachovia dividend was significantly reduced.  As a result, the Karo's lifestyle began to fray.  (Drew's Answer to Third-Part Compl. ¶ 35-38.)  To fix things, in August 2008, using a Power of Attorney Toney had given him, Drew attempted to terminate the Trust and obtain its assets for himself by "disclaiming" his father's interest in the Trust, more than 40 years after its creation, even though the Trust assets were his father's sole source of income and support. (A017,100-09,194.)  In September 2008, Drew, with the assistance of the same law firm that now represents W.A.K. in this lawsuit, submitted a proposed "Non-judicial Settlement Agreement and Order" to Wachovia in hopes of getting the Trust assets that way.  Drew stated throughout these papers that he represented the interests of his minor son W.A.K. in matters involving the Trust, pursuant to the virtual representation provisions of Virginia Code, §§ 55-543.03(6)-(7) and 55-543.04, and that there was no conflict of interest between them and that they had substantially identical interests in the matter.  (A170, 174.). When the Bank refused to accept Toney's "disclaimer," Drew, again represented by the same law firm that now represents W.A.K., sued to force Wachovia to terminate the Trust and deliver its assets to Drew.  (A179-190.)  In November 2008, the Circuit Court for the City of Richmond entered an order finding Toney's attempted disclaimer on behalf of Toney to be invalid.  (Id.)

In January 2009, Drew undertook to lay the groundwork for this lawsuit by submitting a letter to Wachovia purporting to disclaim his own remainder interest in the Trust.  (A110-111.) Drew, however, did not "disclaim" his interest in discretionary distributions because he was relying heavily on the trust to support himself.  (A091-092, 110-111, 195-96.)  In February 2009, on behalf of himself "individually, for [his] father (under his POA) and for [W.A.K.] as his parent and natural guardian" Drew also asked Wachovia to provide information on the trust so they could understand their "rights and remedies."  (A177-78.)   In May 2009, Drew still represented by W.A.K.'s counsel today, submitted to Wachovia a "Tolling Agreement" in which Drew claimed to represent himself individually, and W.A.K. as his parent and natural guardian. (A191-193.)  Drew's counsel then shifted clients, dropping Drew, to represent Page and W.A.K., who filed this lawsuit in August 2009.

Between 2006 and 2008, Drew requested and received $400,000 in discretionary distributions for his support and maintenance from the Trust to curtail debt he owed as a result of various investment mistakes and lavish spending.  (A225 at ¶ 38.)  All requests were reviewed by a committee of the Wachovia Trust Department.  These distributions were not conditioned on Drew using them to pay his Wachovia debt. (Id. at ¶ 37.); (A242 at ¶ 17.)  The Wachovia Trust Department did not consider whether Drew's distributions would be applied to debt owed to the commercial side of the Bank or whether Wachovia would benefit in any way from the distributions.  (A225-26 ¶ 37-39); (A242 at ¶16.)  The Trust Department received no financial benefit from it whether Drew paid off his loans to Wachovia's commercial department or not. (Id.)  The only factors considered by the committee were whether the distributions complied with Rosalie's intent and the Trust's purpose and were in the best interests of all beneficiaries, including W.A.K.  (A242-24 at ¶ 15.)  All distributions were deposited into Drew's checking

account, who alone controlled how to use the funds.  (A225 at ¶ 39.)   In 2008, Drew made additional requests for distributions to curtail debt to Wachovia, which were rejected by the committee.  (A241 at ¶ 16.) (A091-93, 95-97.)  As sole income beneficiary of the Trust, in just the last two decades, Toney has received approximately $2.3 million in income from the Trust, some of which Toney has used to benefit Drew and his family.  (A227-28 ¶ 44); (A049.)  The Karo Trust is currently worth $1.3 million. (A228.)

### III.   STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c).  The party seeking summary judgment has the preliminary burden to demonstrate the absence of a material fact, and "[o]nce a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The party with the burden of proof for an issue at trial bears the ultimate burden of demonstrating that a genuine dispute of material fact exists, and  the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

### IV.   ARGUMENT

#### A.   Governing Trust Law Principles

There are four bedrock principles of trust law that support summary judgment here. **First,** the intent of the grantor is paramount in defining how a trustee should meet its fiduciary duties, *Ward v. NationsBank*, 256 Va. 427,435, 507 S.E.2d 616, 621 (1998); Plaintiff has failed to show sufficient facts that Wachovia did not act in accordance with Rosalie Karo's expressed

intent.  **Second**, the Virginia prudent investor rule for diversification of trust assets is simply a default rule that the grantor may waive by express language in the trust, *Hoffman v. First Va. Bank of Tidewater*, 220 Va. 834, 840, 263 S.E.2d 402, 404 (1980); and Plaintiff has admitted that the Karo Trust contains the requisite waiver of this rule, thus admitting there is no duty to diversify. (Interog. No. 2)[3]  **Third**, Trust beneficiaries may consent to, waive or ratify a trustee's conduct that might otherwise be considered a breach of a duty of prudence or loyalty, Va. Code § 55-548. 02B(4), 55-550.09; here both Toney and Drew consented to, waived, and ratified the Trust's administration and investments, including retention of the Wachovia stock.  In addition, an adult beneficiary can bind a minor having a substantially identical interest in the Trust, Va. Code § 55-543.04.  **Lastly**, a parent's consent and waiver or ratification as to a trustee's conduct binds a minor child, so long as their interests are not in conflict, Va. Code§ 55-543.03; here Drew bound his minor son W.A.K. as to the claims asserted in this lawsuit.

## B.    Wachovia Met Its Fiduciary Duty In Compliance With Rosalie Karo's Intent

### 1.    Rosalie Karo's Trust Agreement Made Clear The Duties Of Her Co-Trustees.

In Virginia as elsewhere, the fundamental starting point for any claim of breach of fiduciary duty has always been to honor the intent of the trust grantor.  *NationsBank of Virginia, N.A. v. Estate of Grandy*, 248 Va. 557, 561, 450 S.E.2d 140, 143 (1994).  If lawful, then a fiduciary's actions taken in fidelity to that intent are not actionable.  *Hoffman*, 220 Va. at 842, 263 S.E.2d at 408.  The Trust Agreement made plain Rosalie Karo's expressed intent: (a) to give Toney a decisive vote in the investment decisions for the Trust by requiring his consent as co-

---

[3] The Plaintiff contends that the earliest date that a breach could have occurred related to the retention of the Bank stock was 1997.  There is no dispute that the Trust consistently maintained a concentration of Bank stock between 1966 and 1997.  The Plaintiff, therefore, has conceded that the duty to diversify was waived between 1966 and 1997 by the trust agreement.  Accordingly, there is no dispute the Trust waived a duty to diversify prior to 1997..  See Pl's Interrog. No. 2 (Dec. 3, 2009) (A198).

trustee in all such decisions, and by electing not to provide in her Trust a method to defeat Toney's consent in the event of disagreements with the corporate co-trustee; (b) to keep the trust assets invested primarily in Bank stock; (c) to allow the co-trustees to make any other investments including the Bank's own stock, in their unfettered discretion; (d) to allow the Bank co-trustee to approve and make distributions to Drew and his heirs for support during Toney's lifetime.  (A066-70.)

2.    There Was No Duty To Diversify Investments As Rosalie Karo Waived The Prudent Investor Rule And Expressly Authorized The Retention Of Stock Of The Bank Co-Trustee

Plaintiff has the burden of establishing that Wachovia breached a duty related to the retention of the Wachovia stock.  Plaintiff has, in fact, admitted that the terms of the Karo Trust waived any duty of the trustees to diversify the Trust's holdings of Bank stock at least until 1997. (A198.)  Even without Plaintiff's admission, it is clear under Virginia law that a grantor may waive the statutory "prudent investor rule" by expressly manifesting an intention in the trust agreement to that effect by an express authorization to acquire or retain a specific asset or type of asset.  Virginia law is also clear that where the grantor has waived the duty to diversify assets, the trustees cannot be held liable for any losses from a failure to diversify, unless the failure was in bad faith. *See Hoffman*, 220 Va. at 839, 263 S.E.2d at 406; Va. Code § 55-550.06 ("A trustee who acts in reasonable reliance on the terms of the trust as expressed in the trust instrument is not liable to a beneficiary for a breach of trust to the extent the breach resulted from the reliance"); Va. Code § 26-45.3 (same).

Rosalie initially funded and approved in her trust a large concentration (55%) of Bank stock.  Rosalie expressly waived the duty to diversify these investments and made it clear that the trustees' retention of the Bank stock was acceptable.  In the decades following the Trust's creation, the portfolio maintained the original concentration of Bank stock, but purchased no new

shares of Bank stock. (Harris ¶ 56.)  Nevertheless, though it had no duty to do so, the Bank pointed out repeatedly to its co-trustee, Toney, the risk of maintaining the concentration and the potential benefits of diversifying.  Each time, Toney rejected the recommendation.  As Rosalie's intent was expressly to allow retention of the Bank stock – including a concentration of it – and to require Toney's consent by the Trust's unanimous co-trustee agreement provision, Wachovia breached no fiduciary duty by continuing to hold the concentration.

3.    Rosalie's Intent And The Trust Retention Language Remain Valid Today Despite The Ruling In *Hirsh* v. *Hirsh*.

The Plaintiff now agrees Rosalie waived the trustees' duty to diversify in 1966 and authorized them to hold concentrations as part of the Trust's portfolio.  (A198).  The Plaintiff, however, contends that at some point between 1997 and 2001 the Trust's retention language somehow became inoperative because of Bank mergers, thereby requiring the trustees to diversify the concentration of Bank stock. (Id.)  Hence, Plaintiff claims a breach of duty occurred when the Bank did not diversify its assets by early 2002.  Simply stated, the Plaintiff argues that the grantor's intent and the Trust's express protections to the trustees were "neutralized" by the Bank's 2001 merger, because the "new" Wachovia stock was not "substantially equivalent" to the CNB stock with which Rosalie funded the Trust in 1966.

The Plaintiff relies on *Hirsh* v. *Hirsh*  for the novel contention that the Bank merger alone overrode the Trust retention language, and contrary to Rosalie's intent imposed by law, a <u>duty to</u> <u>diversify</u> where none had not existed before. 209 Va. 630, 634, 166 S.E.2d 286, 289 (1969).  Yet the facts of *Hirsh* simply do not apply to this case and Plaintiff seeks to stretch it far beyond the bounds intended by the Supreme Court of Virginia.  As an initial matter, *Hirsh* involved a testamentary trust that "prohibited the sale, transfer or exchange of Lock Joint stock," and the trustees sought to avoid that restriction to be able to sell the stock. 209 Va. at 630, 166 S.E.2d at

287.  The issue before the *Hirsh* court was limited to whether the trust's prohibition on selling the stock remained in effect after a merger involving the original company stock.  Following the common law rule, the court held that the duty to retain a specific stock imposed by the grantor would remain in effect following a merger so long as the merger resulted in a stock that was "substantially similar" to the original stock the grantor had identified for retention.

By contrast, there is no question in this case that the trustees they have the power to sell the Bank stock; rather, the question is whether they have a duty to do so.  This issue simply is not raised in *Hirsh*.  Here, Rosalie Karo's trust did not mandate retention of any specific stock, but instead waived any diversification requirement for the Trust's assets.  More fundamentally, while the court in *Hirsh* interpreted the grantor's intent to allow trustees to take certain agreed upon investment choices, the court did not articulate a general rule that a merger of dissimilar businesses imposed a duty on a trustee to take action or risk breaching his fiduciary duty.  The court in *Hirsh* also did not address whether a merger could automatically override the grantor's express intent not to require her trustees to have to diversify and invalidate a general waiver of that duty.  Furthermore, Rosalie's waiver of the "prudent man rule" in the Karo Trust applies not only to the original Bank stock, but also to any investments later acquired by the trustees "including stock in the corporate Trustee or in any of its affiliates and holding companies." (A068 at p8-10.)  The "substantial similarity" analysis of *Hirsh* does not apply if there is a authorization to purchase similar investments in the Trust instrument.  *See* 3 William F. Fratcher, *Scott on Trusts*, § 231.4 at 546 (4th ed. 1988).  Given that Rosalie included express language allowing the purchase of similar securities and specifically those of the "corporate trustee or in any of its affiliates or holding companies," *Hirsh* is inapposite.  Even if the Court were to agree to extend the *Hirsh* holding to this case as Plaintiff asks, Wachovia would still not be in violation

of its fiduciary duty because *Hirsh* would not affect Rosalie's intent that Toney's consent be required before any diversification occur and that the co-trustees could make any investments, including investments in a bank trustee's own stock, in their unfettered discretion.  *See Hoffman*, 220 Va. at 839, 263 S.E.2d at 406.

Moreover, *Hirsh* is not and could not be applicable here because the stock concentration is not ordinary corporate stock, but instead is stock related to a national bank.  The National Banking Act ("Bank Act") governs the corporate existence of the entity resulting from the merger or consolidation of any national bank or state chartered bank with any national banks. *See* 12 U.S.C. § 215a.  Upon completion of the merger or consolidation, the resulting entity is known as the "receiving association."  Pursuant to § 215a(e) of Bank Act,

> The <u>corporate existence</u> of the merging [entities] participating in such merger shall be merged into and continued in the receiving association and such receiving association shall be merged into and continued in the receiving association and such receiving association <u>shall be deemed to be the</u> <u>same corporation as each</u> <u>bank</u> or banking association <u>participating in the merger</u>. (emphasis added).

To follow the analysis of *Hirsh* urged here by the Plaintiff, this Court would be required to assume the role of a bank regulatory agency weighing numerous facts of corporate structures before and after a merger to determine if they were "substantially similar" enough for the investment to have been retained under the Trust.  Federal banking law has already answered this question and deems CNB stock to be the same as its successors.  *Hirsh* did not deal with any entities subject to the Bank Act, which would preempt Virginia law on the issue, including the extension of *Hirsh* the Plaintiff seeks. S*ee Maryland v. Louisiana* 451 U.S. 725, 746 (1981) (holding when a state law conflicts with federal law, state law is preempted and has no effect).

For example, in *Cannon* v. *Dixon*, 115 F.2d 913, 915 (4th Cir. 1940), the issue was whether bank stock received from a merger could be considered a "change of investment" under South Carolina law.  At the time, a trust could only change an investment to the extent it was

authorized by the trust instrument.  The trust at issue did not grant such authority.  The Fourth Circuit held that the "purpose of the Federal statutes as to consolidations of national banks is to continue the identity of the old national bank in the bank into which it is consolidated."  Id.  The Court, therefore, determined that "the identity of the banks is continued in the consolidated bank." and that "the acceptance of the stock in the new Bank did not constitute a new investment but simply continued an investment already held by the estate."  Id.  Under Fourth Circuit precedent, on the issue of the identity of bank stock, federal law preempts the "substantial similarity" analysis that the Plaintiff seek to impose to establish a breach related to the retention of the stock.

Virginia banking law is largely the same on this point.  Virginia Code § 6.1-36, governs the effect of the change of a state bank to a national bank, and states that following a merger or consolidation between a state banking corporation and national bank "[the] national bank shall be deemed to be a continuation of the entity and identity of such state banking corporation . . ." This gives further credence to the protections afforded to trustees who act in reasonable reliance on a trust's terms. Va. Code § 55-550.06.  The retention language continues in place without regard to any Bank merger because the identity of the CNB has continued.  It would be fundamentally unfair to allow the Plaintiff's argument to expand the holding of Hirsh to create a never-before recognized form of "post-merger duty to diversify" that abrogates the plain language of the governing Trust Agreement, ignores the clear policy expressed in Va. Code § 6.1-36 and 55-550.06, and infringes on a field already covered by federal banking law.

4.    <u>Trustees Are Not The Guarantors of Investment Performance</u>.

This case is not the first time disgruntled beneficiaries have, relying on hindsight criticism, asked courts to act as "*uber* referees" and find fiduciaries wanting for failure to

diversify trust assets.   Courts have declined such invitations as plaintiffs seek here to act as "Monday morning quarterbacks" and ignore a grantor's intent and expressed trust agreement provisions.   For example, the Appellate Division of the New York Supreme Court confirmed that a bank co-trustee was not liable for losses attributed to a failure to diversify.   *In re Chase Manhattan Bank*, 26 A.D.3d 824, 829 (N.Y. App. Div. 4th Dep't 2006).   In *Chase Manhattan*, the grantor had funded his trust in 1958 almost entirely with shares of Kodak, and his trust provided for retention of the original stock, unless there was a "compelling reason" to sell it.   In 1998, the Bank co-trustee was sued for losses for failure to diversify the Kodak concentration since trust inception.   The Appellate Court affirmed that the Bank's failure to diversify the concentration was not a "compelling reason" to sell the stock, agreeing such a ruling would have rendered the Trust retention language meaningless.   *Id.* at 828.   The court also rejected the argument that declines in the Kodak stock value in 1973 was a compelling reason to diversify, saying such a ruling was "impermissibly based on nothing more than hindsight." *Id.*

Similarly, in *Estate of Pew*, 655 A.2d. 521 (Pa. Super. Ct. 1994) a Pennsylvania court held that the corporate trustees had not breached any fiduciary duty for failure to diversify a stock concentration in the Trust.   In *Pew* as in this case, the Trust grantor was the wife of a founder of the family business (Sun Oil), who funded her trust in 1932 with a concentration of Sun Oil stock.   *Id.* at 202.   As in this case, the lawsuit claimed the trustee's failure to diversify the stock concentration breached its fiduciary duty to the remainder beneficiaries, because the trustee failed to balance the interests of the life income beneficiary whom it favored by not diversifying, against the remainder beneficiaries.   *Id.* at 541.   The Court rejected both arguments as being any sort of breach of duty. *Id.* at 543.

**C.** **Wachovia Did Not Breach Any Duty Of Loyalty To W.A.K.**

Count II of the Amended Complaint is a grab-bag of grievances purporting to show violations of Wachovia's duty of loyalty to W.A.K..  Before addressing each in turn, it is useful to note, as this Court did in its Memorandum Opinion of November 4, 2009 on the Motion to Dismiss, that the contours of the duty of loyalty prescribed by the Virginia Code§ 55-548.02 and the Restatement (Third) Trusts § 78 (2007) typically cover three topics: (1)  Has the trustee failed to administer the Trust solely in the interest of the beneficiaries? (2) Has the trustee engaged in any self-dealing or conflicting transactions involving the Trust? (3) Has the trustee failed to deal fairly and communicate fully with the beneficiary on all material facts?

As addressed exhaustively above, the answer to all three questions here is plainly "no." Similarly, the uncontroverted evidence as to each of the five asserted grounds in the Amended Complaint fail to show any reasonable basis for a claim of breach of duty of loyalty.

1.   Discretionary Distributions To Drew Were Proper

The discretionary distributions made to Drew were authorized under the terms of the Trust, which allowed Wachovia to make distributions to Drew for his "general welfare and comfort…"  Because the distributions were authorized by the terms of the Trust, the Plaintiff cannot prevail on this allegation.  Va. Code § 55-548.02 (B)(1).  A trustee acting pursuant to an express authorization contained in the trust can only be deemed to have abused its discretion if it is shown the trustee committed fraud, was dishonest, or acted in bad faith.  *Hoffman*. 220 Va. at 843, 263 S.E.2d at 402; *NationsBank of Virginia*, 248 Va. at 562, 450 S.E.2d at 143.  Thus, Plaintiff must establish that Wachovia acted in bad faith or with fraudulent intent in making the distributions to Drew.  This showing is wholly lacking.

Wachovia made the distributions at Drew's request for him and his family's benefit, not Wachovia's. The entity to whom the debt was owed was not a factor in the decision to authorize or deny any requests by Drew. The distributions would have been authorized even if they had been owed to another bank. (A241-42 at ¶¶ 13-17.) Certain requests were deemed appropriate by a supervisory committee, while others were not. The decision was always based on the purpose of the Trust and Drew's individual circumstances. Drew had complete control over the funds once they were paid to him and it was his decision. (A226 at ¶¶ 39-40.) The burden is on the Plaintiff to show there is a genuine dispute regarding Wachovia's motives in making the distributions he seeks to recover for the trust. He cannot do this. Accordingly, summary judgment should be granted.

> 2. <u>Toney Karo Was A Participating Co-Trustee With Whom The Bank Adequately Communicated</u>

Plaintiff also seeks to establish a breach based on the manner in which Toney participated as a co-trustee. Plaintiff complains that Wachovia treated Drew as a co-trustee because it respected Toney's wishes on how he asked to participate in trust decisions and that he wanted Drew to be involved with the trust. Plaintiff appears to have included this claim as an alternate way for Plaintiff to recover the investment losses he seeks. The apparent argument is that if Toney were not participating as a co-trustee, he could have been removed and Wachovia could have then diversified the stock without Toney's permission. This claim would require Wachovia to be clairvoyant: for many years, Toney (a shy and reclusive man) had chosen to handle Trust matters by communicating to the Bank through his son, Drew. Over the years, Drew presented multiple Trust investment documents to his father and discussed these documents with him prior to their execution. (A028,29,33-34,36-37,41-44.) Drew knew all material facts related to his father's health, his participation in the Trust and his interactions and relationship with Wachovia

as co-trustee.   Not only did Drew expressly consent to this arrangement, but he actively participated and indeed repeatedly represented to the Bank that Toney was participating as a co-trustee.

The Virginia Code expressly permits a trustee to utilize agents in carrying out his or her functions.  *See* Va. Code § 26-45.10; and § 55-548.07.  Drew does not dispute that he informed Wachovia of the manner in which his father wished to participate in the trust. (A031).  Thus, the fact Drew was attending meetings at his father's behest, relaying that information to his father, and consulting with him on investment decisions is not a breach.  The fact that Wachovia did not insist over Toney's and Drew's objection to a meeting or call with Toney does not establish any breach of duty, and no case holds otherwise.

### 3.   The Conflict From Holding Wachovia Stock Was Not A Breach of Loyalty

The Plaintiff has abandoned his contention that Wachovia breached a duty of loyalty because it was obligated to provide him "insider information" about the Wachovia stock. (A200.)  The Plaintiff now recycles this argument in contending there was a breach of the duty of loyalty because Wachovia failed to monitor its own stock and provide advice about it to the beneficiaries, as it did on the other investments in the account.  Wachovia repeatedly explained to Toney and Drew that providing substantive advice based on an analysis of the quality of the Bank's own stock would constitute a conflict of interest.  It is fundamental that a corporate trustee has a duty not to offer advice on the fundamentals of its own stock, including its affiliates, because to do so would constitute a conflict of interest.  The Plaintiff, however, wants to claim that by not breaching one duty Wachovia breached another duty.  No authority exists for this position.  The Plaintiff ignores that the grantor funded the trust with the corporate trustee's own stock and authorized the trustees to retain that stock as well as to acquire additional shares of it.  In authorizing the trustees to hold the corporate trustee's stock, the grantor accepted the

fact the corporate trustee would be incapable of offering advice on the stock's fundamentals. *See* Restatement (Third) of Trusts §78, comment c2 (2007) ("fiduciary duty of loyalty is a default rule that may be modified by the terms of the trust."); Va. Code § 55-548.02 (same).

The Virginia Code also explicitly allows a corporate trustee to hold its own stock or that of an affiliated entity where the trust instrument so authorizes.  Va. Code § 6.1-23.  By necessary import from § 6.1-23 , since a corporate trustee may be allowed to hold its own stock, it may not be held to violate any duty to monitor its own stock because the conflict would necessarily preclude it from doing so.  Wachovia, nevertheless, actively communicated to Drew and Toney that while it could not provide advice on the merits of the Wachovia stock, this prohibition was another reason why the stock should be sold as a Trust investment.  Drew and Toney rejected this advice.  There is no question in this case that under the Trust Agreement and the grantor's intent, Toney Karo as co-trustee was entitled to exercise control over investment decisions.; or that Toney Karo consistently rejected the Bank's recommendation to sell Wachovia stock (App.____); or that Toney Karo regularly communicated his decisions on Trust investment decisions to the Bank in signed documents such as the Investment Policy Statements and LORs. (App__-).  The simple fact here is that in hindsight Plaintiff wants to complain about Toney Karo's decisions, and blame the Bank for not ignoring him and the terms of the trust by going around him to diversify.  The Bank's fidelity to the Trust Agreement and the way it communicated with Toney Karo in no way is a breach of duty of loyalty, and the fact that the Plaintiff cannot cite a single case to support this facet of their argument speaks eloquently of its baselessness.

4.     <u>Wachovia Did Not Fail To Act As Sole Trustee</u>

Plaintiffs' argument here is but a slight variant of its second contention above (**C.2**). There is no issue in this case about Toney's mental capacity to serve as co-trustee on which they

are basing any claim(A203-05).[4]  Plaintiffs seem to argue one of two things here:  (a) that the Bank's acceptance of the way Toney chose to communicate through Drew to the Bank was inherently a breach of duty; or (b) the Bank was obliged to ignore Toney's role set out in the Trust Agreement and assume sole control.  There is no basis or legal authority to support either contention.

>    5.      There Was No Breach For Not Seeking Aid And Guidance From A Court

Finally, the Plaintiff contends that Wachovia's failure to seek aid and guidance from a court  because it disagreed with its co-trustee amounted to a breach of the duty of loyalty.  In Virginia, grantor intent as expressed through the Trust instrument must be honored.  The Trust instrument evidences the grantor's intent was to condition any investment actions on the unanimous decision of the trustees.  Moreover, if this were unclear and this Court looked outside the document, the intent as expressed by Rosalie to the Bank was that Toney was to have complete control.  (A122-125).  Wachovia could only act to diversify the account to the extent Toney agreed.  He adamantly opposed sale of the stock.  By choice of the grantor, the trust instrument provided no means to "break any tie" between the trustees, nor did it impose a duty that they seek guidance to the extent they disagreed.  Rather, the import of the Trust was that the status quo was to be maintained.  There is no Virginia authority that imposes a duty for a trustee to go to court where one trustee advocates diversification, but a fiduciary with joint investment authority refuses to agree and is given the authority to maintain the investment. *Accord In re Trust of Emanuel Rosenfeld*, 2004 Phila. Ct. Com. Pl. LEXIS 130, at *18-23 (Ct. Com. Pl. May 19, 2004) (holding corporate trustee had no duty to seek aid and guidance because "under the

---

[4] Shortly after Faye Harris first became aware of a doctor's report as to Toney's possible Alzheimer's disease in December 2008, she wrote to assert the Bank was assuming the role of sole trustee.

trust agreement, it lacked authority to effectuate [its] advice unilaterally" nor "authority to override a deadlock" with co-trustees).

Even if such a duty existed, any damages that would flow from such a breach would be entirely speculative.  The Plaintiff cannot establish with any certainty that a court would have sided with Wachovia over Drew and Toney, especially considering the low cost basis of the stock, the family connection they had to the stock, and the express language in the Trust allowing Toney, as an individual co-trustee, to retain the stock as long as he deemed advisable.  Indeed, it is improbable that a Virginia court would have overridden the clear choices of two adult men – the current income beneficiary, and co-trustee with absolute veto rights over investment choices, and the sole presumptive taker of the assets to whom legal title of the property was set to vest, who expressly wished to retain the asset.

**D.      Wachovia Is Entitled to Summary Judgment For All Plaintiff's Claims.**

Even if Plaintiff's claims in both Counts I and II were to survive the points noted in section **IV-B** and **C**, they must fail because Plaintiff's father, Drew, consented to Wachovia's actions and ratified the very same investment and distribution decisions on which Plaintiff now bases his claims.  By Drew's own actions on multiple occasions, he has acknowledged that as Plaintiff's father and as a beneficiary with substantially identical interests to his son, he virtually represented and thereby could bind Plaintiff in matters involving the Trust.  Accordingly, Drew's execution of the LORs expressly releasing all claims from Wachovia's continued retention of the Bank stock was equally binding on Plaintiff.  Drew (through Plaintiff) cannot now rely on artificial technicalities as a means for recovering losses related to the Trust's retention of the Wachovia stock pursuant to his own authorization, whether those claims are styled as a breach of the duty of prudence or a breach of the duty of loyalty.  *See* Va. Code § 55-548.02 (providing

that duty of loyalty claim is barred if "beneficiary consented to the trustee's conduct, ratified the transaction, or released the trustee.")

Plaintiff has conceded that for years before and after his birth, his father Drew consented to and ratified the Trust's concentration of Bank stock – the same investments on which he now seeks to premise recovery.   Equity precludes a beneficiary from asserting a claim against a trustee for any conduct that he or she has consented to or ratified.   This same principle equally bars the Plaintiff's claims, as his interests were virtually represented by Drew in all matters involving the Trust.

1.   No Liability Exists Where A Beneficiary Consents To Or Ratifies The Conduct
He Claims Is A Breach Or Otherwise Releases The Fiduciary From Liability.

Virginia common law has long recognized the equitable principle that no actionable breach of a fiduciary duty exists if the beneficiary: (1) consents to the conduct before it occurs; (2) ratifies the conduct after it has occurred; or (3) subsequently releases the fiduciary from liability.   *See Harris v. Citizens Bank, Etc. Co.*, 172 Va. 111, 128, 200 S.E. 652, 658 (1939). This equitable principle was codified in the Virginia Uniform Trust Code (the "VUTC") in 2006. *See* Va. Code § 55-550.09.   Accordingly, Plaintiff cannot recover any losses under Count I or II if the conduct contributing to the loss was consented to or ratified, or a release was provided. The only exception to this rule is if the consent, release or ratification was induced by the trustee's improper conduct or if the beneficiary did not know of his rights or of the material facts relating to the breach at the time.   *Id.*   Plaintiff has not alleged that Wachovia induced Drew's consent through improper conduct.   Further, Drew knew, or certainly should have known, his rights and the material facts relating to the alleged breach.   *See* Va. Code § 55-541.

Drew became involved in the Karo Trust as a young adult. (A026)   He frequently attended meetings with the Bank's Trust Department and provided his input on the Trust's

investments. (A126).  Drew had full knowledge of the Trust's investments.  Since at least 2001, Drew's only job was managing his personal investments, most of which consisted of Wachovia stock received through inheritance and from which he supported his family. (A112-13 ).  Drew's conversations with various Wachovia employees showed him to be closely familiar with all financial aspects of the Bank's business.  (A206, 214 230.).  He actively traded stocks and participated in transactions that showed him to be an above-average investor. (A059,114-121.) He had worked at a bank and been an investor in and on the board of a private trust company. (A112-13)  He had been successful as a real estate entrepreneur.  In short, Drew was a sophisticated investor.  Moreover, when Faye Harris took over as trust advisor for the account in 2000, she and the portfolio manager actively engaged with Drew regarding the Trust's investments and personally discussed with him the benefit of diversification and the risks that a concentrated portfolio can hold.  Between 2001 and 2008, Drew affirmatively communicated his desire that the concentration was to be maintained, which he expressed verbally and in multiple written documents. (A219-20 ¶ ¶17-20.)  During these years, Drew attended multiple meetings with Harris and the portfolio manager.  In each of these meetings, Wachovia verbally informed Drew:  (1) about the risk that a concentration can pose to a portfolio, (2) about the implications of the Trust holding a concentration of its own stock, and (3) that Wachovia could not offer advice about its own stock; provide an analysis of its stock; or otherwise monitor its own stock. (A223 ¶¶ 29-31); (A232 ¶ 232.)   In each of these meetings, Drew also expressly confirmed his desire for the Trust to hold the concentration, and he willingly executed three LORs because they comported with his strong desire to hold the stock.  (A077-84.)

Although Drew was informed by Wachovia that a diversified portfolio provided similar opportunities for return as a single investment with less risk of loss, Drew opposed the

substantial reduction in assets the Trust account would incur through capital gains taxes, which he viewed as more of a threat to the Trust's residue than any lack of diversification. He strongly wanted the position retained to preserve and grow the inheritance he expected to receive at Toney's death. He also viewed his son as having a similar interest in growth. (A050.) Even so, Wachovia did not simply rely on the text of a letter to disclose to Drew and Toney the implications of this decision. Wachovia fully and repeatedly discussed with Drew all material facts concerning the retention of the stock by the Trust. This was done both before and after the LORs were signed. Wachovia also directed Drew to consult with his attorney if he had any questions. Accordingly, Plaintiff cannot now complain that any material facts were hidden from his father. Drew understood his rights and the ramifications of his requests, and he is now bound by them. The only remaining issue is whether Drew's consent and ratification effectively bound Plaintiff.

2.   A Minor Beneficiary May Be Represented And Bound By Another In Trust Matters

Drew and Page Karo have attempted to avoid the clear consequences of Drew's actions through the transparent boot-strap maneuvers of Drew first disclaiming his remainder interest in the Trust so as to elevate his son's status to something more than a discretionary or alternate taker of the residue of the Trust, and then having Page bring this suit in their son's name. Such attempted cleverness is not supported by law and should not be encouraged by this Court. Wachovia knows of no authority, in Virginia or any other forum, where such a blatant attempt to subvert equity has been indulged by a court. Drew's consent, ratification and release with respect to any claims related to the retention of the Wachovia stock bound Plaintiff by virtual representation just as if Plaintiff had done so himself. "The consent of a person who may represent and bind another person under [the UTC] is binding on the person represented." Va.

Code § 55-543.01.  Significantly, a representative may virtually consent to, or ratify conduct amounting to a breach or otherwise release a claim a minor or unborn child may have against a fiduciary.  *See* UTC comment to Section 1009 (attached at A259); *see also* Restatement (Third) of Trusts § 97 (Draft No. 5 2009) (providing that a beneficiary without capacity may be bound by the "act of or representation by another" in providing consent, ratification, or release of a breach) (attached at A244-50.)

The UTC provides two methods by which Drew can be said to have bound Plaintiff:

- A parent may represent and bind his minor or unborn child to the extent there is no conflict of interest between the two with respect to the particular question or dispute.  Va. Code § 55-543.03.  This rule is based upon the premise that a parent has a natural incentive, in the absence of an actual conflict, to protect his child's best interests.

- A minor or unborn beneficiary may be represented and bound by <u>any person</u> "having a substantially identical interest with respect to the particular question or dispute, but only to the extent there is no conflict of interest with respect to the particular question or dispute[.]" Va. Code § 55-543.04.  This rule is based upon the Virginia common law principle that, "[a]s a general rule, the interest of a contingent beneficiary [could] be represented by another contingent beneficiary under the doctrine of 'virtual representation' if the interests [were] sufficiently similar to insure adequate representation[.]"  *Nationsbank of Virginia,* 248 Va. at 650, 450 S.E.2d at 142.  In other words, one beneficiary may bind another who cannot represent himself (e.g., a minor or unborn beneficiary) if the nature of their beneficial interests is such that it would be reasonable to expect that the representing beneficiary, in defending his or her own interests, would be equally defending the represented beneficiary's interests.  A "substantially identical interest" is commonly identified by a shared economic interest.  *See UTC*

*official comment*, Section 304. (A258.).   Here, Drew is not only Plaintiff's father and thereby entitled to represent him under Virginia Code § 55-543.03, but in addition, Drew's economic interests in the Trust were identical to Plaintiff's during all times he consented to and ratified the conduct at issue here.   Both were current discretionary principal beneficiaries and, although Drew was the presumptive remainderman, Plaintiff would step into his father's shoes if Drew died before Toney.   Thus, Drew, as a contingent remainderman, had every economic incentive to protect his own beneficial interests in the Trust, and by doing so, he would necessarily be protecting Plaintiff's.   He was therefore entitled to represent and bind Plaintiff under both Virginia Code § 55-543.04 and common law.

     a.      <u>Virtual Representation Applies Here Because No Conflict Existed On The Issue Or Dispute In Question</u>.

Virtual representation is premised upon the assumption that the representing person has every reason to protect the represented person's interests, i.e., where there is no conflict of interest between the two on the particular issue or dispute in question.   Courts analyzing whether an actual conflict exists have focused on whether the representing party has an incentive to act in a manner that would ensure the adequate representation of the represented party. *See, e.g., Indian Head Nat. Bank v. Theriault*, 96 N.H. 23, 69 A.2d 226 (N.H. 1949).

Where, as here, there is an absolute identity between their beneficial interests and, in addition, there is a parent-child relationship, there is no question of a conflict between them with respect to the trust's investments.   The mere possibility their interests could become antagonistic under other circumstances does not preclude the application of virtual representation, especially when their interests are aligned on the relevant question or dispute.   *See, e.g. In re Estate of Putignano,* 82 Misc. 2d 389, 391 (N.Y. Sur. Ct. 1975) ("the same economic interest between representor and representee may exist in one kind of a proceeding but not in a different

proceeding."); *In re Estate of Fuller*, 57 Misc. 2d 174, 175 (N.Y. Sur. Ct. 1968).   Under the UTC, the proper inquiry is whether there is an <u>actual conflict</u> on the <u>specific issue</u>, not whether there could be a <u>conceivable conflict</u> on some <u>unrelated</u>.

The Plaintiff seeks to recover losses incurred by the Trust related to the holding of Wachovia stock.   Therefore, only a conflict of interest with respect to the investments would disqualify Drew from virtually representing his son.   On the many occasions Drew requested that the Bank stock be retained, he was both a current discretionary principal beneficiary and the presumptive taker of the Trust's residue at Toney's death.   Plaintiff was also a current discretionary principal beneficiary entitled to distributions on the same terms as Drew, and he and Drew's other descendants, if any, were in line to receive the Trust residue if Drew predeceased Toney.   Neither Drew nor Plaintiff has any interest in the Trust income, all such income was paid to Toney.

Beneficiaries with a remainder interest in the residue of a Trust and no income interest have a "shared interest in achieving [a] maximum possible funding" for the Trust. *See In re Estate of Abrams*, 242 A.D.2d 450, 451 (N.Y. App. Div. 1st Dep't 1997) (holding parent released any claim by minor child against trustee through virtual representation).   They will benefit most from investments in growth assets, rather than those that produce income.   In this sense, Drew and Plaintiff had an identical interest in the Trust investment matters.   Drew also has recognized this principle.   (A050)   Thus, Plaintiff's interests were adequately represented at all times in two regards: (1) by the parental relationship between Drew and W.A.K., and (2) by Drew's economic self-interest in the residue, which was identical to his son's.   There was no conflict between Drew's self-interest as a current permissive principal beneficiary and remainderman and his son's in matters involving the Trust's investments.

To avoid the clear application of Virginia law in this regard, Plaintiff has tried to manufacture an "actual conflict" on the question of investments.  Plaintiff argues that he could not be virtually represented by his father because the two had "substantially different investment objectives."  In other words, while both Drew and his son equally stood to benefit from the appreciation in trust value prior to the 2008 recession, Plaintiff now claims in hindsight that he would have been interested in safer investment objectives so that the Trust corpus was available for his future needs.  This argument rings hollow and fails in three ways.  First, the inquiry into whether a conflict exists is objective, not subjective.  *See* UTC § § 303-304, official comment (A257-58.)  Just as a beneficiary cannot use hindsight to claim a breach of trust for failure to diversify, a minor beneficiary cannot use hindsight to manufacture a conflict of interest so as to undo binding representation retroactively.  To allow such a result would essentially make it impossible to employ virtual representation in any non-judicial context in Virginia.  This is clearly contrary to the Virginia General Assembly's intent when enacting the VUTC. *See, e.g.,* Va. Code 55-543.01B.  The fact that, with hindsight, a virtually represented beneficiary might have elected to act differently if given a "do over" does not mean a conflict exists.

Second, the Plaintiff's feigned conflict claim is speculative at best.  He speculates about a conflict because his interest in future discretionary principal distributions from the Trust (although identical to Drew's) *may* be limited by the amount of the Trust assets.  In fact, the trust assets stand now at over $1.3 million.  (A228.)  Even if Plaintiff is correct that future distributions may be limited, that same hypothetical limitation applies to Drew's interest in future discretionary principal distributions as well.  Thus, their interests remain identical in all respects and there is no conflict.

Third, Plaintiff's argument ignores the evidence that Drew did, in fact, considered not just his own best interests, but those of his family (including Plaintiff), when making decisions regarding the Trust's retention of the Bank stock. Drew believed it was in his family's economic interest to hold the concentration of Wachovia stock because of the heavy capital gains that would be incurred by diversifying and the potential appreciation of the stock. This directly refutes Plaintiff's manufactured "conflict" argument.

b. Drew's Actions Are Binding Upon His Son.

The record is clear that in the years immediately following Plaintiff's birth Drew continued to regularly meet with Wachovia regarding the Trust's investments. In each of meetings between 2001 and 2008, Drew explicitly and unequivocally expressed his desire that the Trust's position in the Bank stock be retained and requested that the Trust continue to hold the concentration. Each time, Drew committed to discussing the diversification recommendation with Toney, the co-trustee, and each time the reported response from Toney was the same: do not sell the Wachovia stock in the Trust. Drew's actions amount to consent and ratification and are binding under Virginia Code § 55-550.09. Hindsight does not vitiate Drew's consent to and ratification of the holding of the stock.

The case of *In re Estate of Lange*, 75 N.J. 464, 383 A.2d 1130, (1978), clearly illustrates how a parent's consent can be attributed to bind his minor children. In *Lange* is directly on point with this case. Like here, the grantor left his residuary estate in a trust, with his spouse as co-trustee and the income beneficiary at whose death the residue was to be distributed "to the [grantor's] then living issue per stirpes." 75 N.J. at 470, 383 A.2d. at 1133. Certain assets from the trust were sold to raise funds to pay taxes, but because the co-trustee wife did not wish to raise money by selling the trust's primary asset – Colonial National Bank stock –the Trust

obtained a loan for which it pledged the Colonial stock. *Id*. at 471, 383 A.2d at 1133.  Her adult children, the contingent remainderpersons, raised no objections to the loan, and in subsequent years they continued to validate the holding of the stock because they believed it was undervalued.  *Id*.  However, in the subsequent years, the Colonial stock declined so much that it was insufficient to pay the loan.  The probate court held that the loan was outside the scope of the fiduciaries' powers, making the fiduciaries liable for the transaction, and although the adult beneficiaries consented to the transaction, their consent to the loan did not bind their minor or unborn issue.  *Id*. at 476, 383 A.2d at 1135.  On appeal, the New Jersey Supreme Court reversed, holding that although the transaction fell outside the scope of the fiduciaries' powers, the transaction had been consented to originally and ratified thereafter by all interested beneficiaries.

*Lange's* application of the doctrine of virtual representation "in the context of beneficiary consent to improper or dubious fiduciary conduct" has served as the theoretical underpinning upon which the VUTC's provisions on "virtual representation" are based.  *See* Restatement (Third) of Trusts § 97  (A44-50.)  Accordingly, this Court should apply the reasoning of *Lange* in granting summary judgment for Wachovia.  In *Lange*, as is true here, there was a sufficient nexus between the children and their ancestral predecessors-in-interest, the parents, to justify binding the children.  *See also Beyer v. First National Bank*, 843 P.2d 53, 61-62 (Colo. Ct. App. 1992) (holding that where there is an authorization for a parent to act for child, parent's consent to investment decisions is binding on minor children).   Finally, Drew has expressly acknowledged in multiple legal documents prepared by WAK's current counsel that he is the virtual representative for his son in Karo Trust matters.  (A170, 174, 177-78.)  He cannot erase this result simply by a change in counsel.  This Court should reject such an attempt at legal approbating and reprobating.

**E.  Partial Summary Judgment Should Be Entered Against Drew Karo For Contractual Indemnification (Count I of Third-Party Complaint).**

Wachovia has asserted a claim for contractual indemnification in its Third-Party Complaint (Count I)  against Drew Karo for which it entitled to partial summary judgment. Drew Karo executed letters of retention in 2007, 2005, and 2004 (collectively, the "contracts"). By these contracts, Drew agreed to indemnify Wachovia for any liability assessed against it related to the retention of the Wachovia stock as well as to reimburse it for all costs and expenses incurred in any litigation related to the retention of the stock.   The last contract for indemnification was executed by Drew on or about November 7, 2007.  Drew agrees that he signed each contract.

Even where liability on the primary action has not yet been determined, a claim for indemnity is "one of those questions that is particularly appropriate for summary judgment" because any unresolved issues are primarily legal rather than factual.  *Cochran v. Gehrke, Inc.*, 293 F. Supp. 2d 986, 990 (N.D. Iowa 2003).  Virginia courts reviewing indemnity agreements "begin with the principle that the law looks with favor upon the making of contracts between competent parties upon valid consideration and for lawful purposes."  *Estes Exp. Lines v. Chopper Exp.*, 273, Va. 358, 364, 641 S.E.2d 476, 478 (2007).  The courts then look to the intentions of the parties as expressed in the terms of the agreement.   "When the terms of a contract are clear and unambiguous, a court must give them their plain meaning."  *Pocahontas Mining L.L.C. v. Jewell Ridge Coal Corp.*, 263 Va. 169, 173, 556 S.E.2d 769, 771 (2002).  Even in the case of a fiduciary relationship, under Virginia law, [i]n the absence of fraud, duress, or mutual mistake, a person having the capacity to understand a written document who reads it, or, without reading it or having it read to him, signs it, is bound by his signature."  *Metro Realty of Tidewater, Inc. v. Woolard*, 223 Va. 92, 99, 286 S.E.2d 197, 200 (1982) ("The record shows

Woolard, a mature businessman, had the capacity to understand the terms of both the contract and the addendum."). Finally, where a right to indemnification is provided for by express terms in a contract, unless otherwise provided in the contract, the right to recover also "extends to any expense reasonably incurred…including proper legal costs and expenses incurred in defending an indemnified claim made by a third party against the indemnitee." *American Spirit Ins. Co. v. Owens*, 261 Va. 270, 275, 541 S.E.2d 553, 555 (2001).

There is no dispute that Drew signed these contracts nor is there any dispute the terms provide Wachovia with a right to indemnification for all costs, attorneys' fees, and expenses it has incurred in both its corporate and fiduciary capacities as well as for any damages assessed against it in the primary action related to the retention. Here, the plain language of the contracts disclosed to Drew all material facts related to his decisions to retain the Wachovia stock and indemnify the corporate trustee for all claims, costs, and expenses, including attorneys' fees, related to any litigation associated with his investment decision. The contracts expressly recommended Drew consult counsel if he had any questions, and in fact, at the time of each contract he signed, he was using counsel on other matters.

Based on the plain language of the indemnification contracts, Wachovia is entitled to summary judgment that Drew will be liable to Wachovia for the amount of any damages that may be assessed against Wachovia related to the Trust's retention of the investment Drew requested be retained. Wachovia is also entitled to partial summary judgment on the issue of Drew's contractual liability to it for all costs and expenses, including attorneys' fees, it has incurred related to defending the primary action and bringing its indemnity claim. Wachovia's entitlement to these costs, fees, and expenses is not dependent on the outcome of the primary action. Wachovia has incurred significant legal expense in defending the primary action and will

continue to incur such expenses.  A final amount cannot be fully determined until resolution of the Plaintiff's claims.

## V.    CONCLUSION

There are no disputed material facts here.  For over 40 years, the Trust has served the purpose Rosalie Karo intended: it provided millions of dollars of income to pay for all of Toney's needs, with some income also benefitting Drew Karo's family, while also preserving a Trust residue over $1.2 million for grantor's issue.  Since its inception, neither Toney nor Drew (or his family) has ever complained or criticized the Trust's investment concentration in Bank stock.  Quite the contrary:  they wanted the concentration to remain and have reaped the rich rewards it has paid them over the years.  Indeed, for the past 20 years, Wachovia has been the one to point out to them, time and time again, the dangers of over-concentration and the benefits of diversification, which advice was consistently rejected.  This Court sitting in equity should not countenance the procedural end-runs by the Karos.

Respectfully submitted,

**WACHOVIA BANK, N.A.**


By _____/s/_____
                                Counsel

D. Alan Rudlin (Bar # 17010)
William P. Childress (Bar # 72823)
*Counsel for Wachovia Bank,*
*National Association, Trustee*
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia  23219
Phone:  804-788-8200
Fax:  804-788-8218
Email: arudlin@hunton.com
Email:  wchildress@hunton.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 15th day of March 2010, I will electronically file the attached Memorandum of Law In Support of Wachovia Bank, N.A.'s Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send a notification of that filing (NEF) to the offices of the following:

Paul McCourt Curely, Esq.
Canfield Baer LLP
2201 Libbie Avenue, Suite 200
Richmond, Virginia  23230

*Counsel for William A. Karo*


Joseph E. Blackburn, Jr., Esq.
Blackburn, Conte, Schilling & Click, PC
300 West Main Street
Richmond, VA  23220
Telephone: (804) 782-1111
Facsimile: (804) 648-3914

Bowlman T. Bowles, Jr., Esq.
Churchill G. Bowles, Esq.
Bowles & Whitehead PC
P.O. Box 12085
404 W Franklin Street
Richmond, VA  23241-0085
Telephone: (804) 780-0236
Facsimile: (804) 780-9134

*Counsel for Plaintiffs*

_____/s/_____
William P. Childress (Bar # 72823)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia  23219
Phone:  804-788-8200
Fax:  804-788-8218
Email: arudlin@hunton.com
Email:  wchildress@hunton.com